**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Sean C. Southard
Maeghan J. McLoughlin

**Hearing Date: August 13, 2015**
**Hearing Time: 3:30 p.m.**

**Objection Deadline: August 12, 2015**

*Proposed Counsel to the Debtors and Debtors in possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re                                             :     Chapter 11
                                                :
HYPNOTIC TAXI LLC, et al.,[1]              :     Case No. 15-43300 (CEC)
                                                :
                        Debtors.             :     (Jointly Administered)
-----------------------------------------------------------x

**DEBTORS' OBJECTION TO THE EMERGENCY APPLICATION OF CITIBANK, N.A., FOR AN ORDER: (I) DIRECTING TURNOVER OF PROPERTY OF THE ESTATE; (II) AUTHORIZING EXAMINATIONS PURSUANT TO FED. R. BANK. P. 2004(a); (III) DIRECTING THE DEBTORS TO OPEN DEBTOR IN POSSESSION BANK ACCOUNTS; (IV) PROHIBITING DEBTORS USING CITIBANK, N.A.'S CASH COLLATERAL ABSENT AN ORDER OF THIS COURT OR AUTHORITY FROM <u>CITIBANK; AND (V) PROVIDING OTHER FORMS OF RELIEF</u>**

**TO THE HONORABLE CARLA E. CRAIG,**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

        Hypnotic Taxi LLC, along with the other debtors (collectively, the "<u>Debtors</u>" and each a

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Hypnotic Taxi LLC (6632)(Case No. 15-43300); (ii) Bombshell Taxi LLC (1282)(Case No. 15-43301); (iii) Bourbon Taxi LLC (7155)(Case No. 15-43302); (iv) Butterfly Taxi LLC (6992)(Case No. 15-43303); (v) Candy Apple Taxi LLC (0249)(Case No. 15-43304); (vi) Chianti Taxi, LLC (6799)(Case No. 15-43305); (vii) Chopard Taxi Inc. (0746)(Case No. 15-43306); (viii) Cupcake Taxi LLC (0324)(Case No. 15-43307); (ix) Dorit Transit Inc. (9129)(Case No. 15-43308); (x) France Taxi LLC, (9592)(Case No. 15-43309); (xi) Hennessey Taxi Inc. (4039)(Case No. 15-43310); (xii) Iceberg Taxi Inc. (5877)(Case No. 15-43311); (xiii) Marseille Taxi LLC (9890)(Case No. 15-43312); (xiv) Merlot Taxi LLC (7103)(Case No. 15-43313); (xv) Milkyway Cab Corp. (5061)(Case No 15-43314); (xvi) Palermo Taxi, Inc. (5956)(Case No. 15-43315); (xvii) Pinot Noir Taxi LLC (6725)(Case No. 15-43316); (xviii) Pointer Taxi LLC, (2323)(Case No. 15-43317); (xix) Pudding Taxi Inc. (0432)(Case No. 15-43318); (xx) Stoli Taxi Inc. (4079)(Case No. 15-43319); (xxi) Vodka Taxi LLC (4239)(Case No. 15-43320); and (xxii) VSOP Taxi Inc. (3909)(Case No. 15-43321).

"Debtor") in the above-captioned cases (the "Chapter 11 Cases"), hereby respectfully submits this objection (the "Objection") to the emergency application (the "Application") of Citibank, N.A. ("Citibank"), for entry of an order, (I) directing turnover of property of the estate; (II) authorizing examinations pursuant to rule 2004(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (III) directing the Debtors to open debtor in possession bank accounts; (IV) prohibiting Debtors' use of Citibank's cash collateral; and (V) providing other forms of relief, and respectfully represent as follows:

## PRELIMINARY STATEMENT

Citibank's emergency Application made on just three days' notice is wasteful and entirely unnecessary. Citibank's Application is part of a continuing and persistent strategy to destroy the Debtors' business through aggressive litigation and economic attrition without regard to the Debtors or their other creditors. Citibank's ultimate goal is a mystery to the Debtors. If Citibank actually gets what it wants – the seizure of the Debtors' forty-six taxi medallions – it has no way to liquidate them at this time. Such a result would be devastating to the Debtors, Citibank, the medallion market and most importantly, the Debtors' other creditors. Citibank should stop litigating for a moment and actually work with the Debtors (and any creditors' committee) towards proposal and confirmation of a plan that is fair and appropriate for all of the Debtors' stakeholders.

As set forth below, an overwhelming majority of the issues raised in the Application have been addressed in the Debtors' prior filings. Also, any discovery by Citibank pursuant to Bankruptcy Rule 2004 should be carefully tailored to ensure that Citibank is not inappropriately using Bankruptcy Rule 2004 to further its litigation against the Debtors. Further, discovery should be delayed to give the United States Trustee an opportunity to solicit interest and form a

creditors' committee, which should take part in any such discovery.

Accordingly, the Debtors respectfully request that the Application be denied and that consideration of any request for discovery be adjourned pending formation of a creditors' committee so that discovery can be coordinated, cost-effective and efficient.

## INTRODUCTION

1. On July 22, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the or this "Court").

2. The Debtors continue to manage their businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of the filing of this Motion, no trustee, examiner or committee has been requested or appointed.

3. Prior to the Petition Date, the Debtors retained Joshua Rizack of The Rising Group Consulting, Inc. to perform the functions and hold the title of Chief Restructuring Officer (the "CRO") of the Debtors and on July 31, 2015, the Debtors filed a motion with this Court seeking approval of the CRO's retention (the "CRO Motion") [Docket No. 18].

## BACKGROUND

a. **The Debtors' Business and the Case Thus Far**

4. The Debtors are either limited liability companies or corporations that each own either two or three New York City taxi medallions (the "Medallions") issued by the New York City Taxi and Limousine Commission ("TLC") and related vehicles (the "Taxi Vehicles"). The Debtors collectively own forty-six (46) Medallions and Taxi Vehicles.

5. The operation of the Debtors' Medallions and related Taxi Vehicles is done through the following four related non-debtor management companies (collectively, the "Management Companies"): (i) 28th Street Management, Inc. – 313 10th Avenue, New York, NY 10001, (ii) Downtown Taxi Management, LLC – 330 Butler Avenue, Brooklyn, NY, (iii) Woodside Management, Inc. – 49-13 Roosevelt Avenue, Woodside NY, 11377, and (iv) Tunnel Taxi Management, LLC – 44-07 Vernon Blvd, LIC, NY 11101. The Management Companies lease the Medallions and the related Taxi Vehicles directly from the respective Debtor and operate them. The Management Companies' lease payments equal the amount of debt service to Citibank.

6. Prior to the commencement of the Chapter 11 Cases, the Debtors did not maintain their own bank accounts and all lease payments due the Debtors were paid by the Management Companies directly to Citibank or other recipients. On July 31, 2015, the Debtors filed a motion for approval of a cash management system (the "Cash Management System") whereby Hypnotic Tax LLC (the "Lead Debtor") will maintain a debtor in possession bank account (the "DIP Account") in accordance with United States Trustee Operating Guidelines. The DIP Account will house all lease payments from the Management Companies and borrowings from the proposed DIP Lender (as defined below), and make disbursements to fund operations or as authorized by the Court (the "Cash Management Motion") [Docket No. 17]. The Debtors believe that the proposed Cash Management System will ensure that the Debtors identify and safely maintain their funds pending approved disbursements.

7. Also on July 31, 2015, the Debtors filed a motion (the "DIP Motion") [Docket No. 16] seeking authority to borrow from Philadelphia Taxi Management LLC (the "DIP Lender") pursuant to the terms of a certain debtor in possession loan agreement (the "DIP

4

Loan"). The proposed DIP Loan is unsecured and will be subordinated to each and every creditor of the Debtors. The DIP Loan is designed to ensure that the Debtors can pay the costs of administering their Chapter 11 Cases without using any funds that could arguably be considered Citibank's cash collateral.

8. The CRO Motion, the Cash Management Motion and the DIP Motion are each returnable before the Court on August 26, 2015.

### b. The Debtors' Obligations to Citibank and Pre-Petition Litigation

9. In January 2012, each of the Debtors became obligated to Citibank with respect to a separate loan made by Citibank to each of the Debtors (collectively, the "Citi Loans" and individually a "Citi Loan"). Each of the Debtors executed its own separate and distinct promissory note in the principal amount set forth in the Debtors' schedules. To secure each Citi Loan, each of the Debtors entered into its own separate and distinct security agreement in which each of the Debtors pledged its own Medallions and substitutions for, additions to, proceeds and products thereof, etc. (collectively, the "Collateral") to secure each Debtor's own obligations under its single Citi Loan. Pursuant to each of the notes, each of the Debtors was required to make monthly payments, which included a payment towards the principal amount and interest. Accordingly to Citibank, the Debtors' collective obligations under the Citi Loans approximate $34 million. The Debtors dispute at least $4 million of that amount which constitutes default rate interest and other penalties.

10. On or around May 8, 2014, Citibank sent the Debtors a letter providing notification that it would be terminating the cash management accounts effective May 23, 2014 (the "Termination Letter").

11. On or about November 6, 2014, Citibank sent the Debtors a letter advising that Citibank would be terminating the entire banking relationship between Debtors, the Debtors' principal, Evgeny Freidman, and Citibank (the "Banking Termination Letter") effective December 15, 2014.

12. On or about March 6, 2015, the matter of *Citibank, N.A. v. Bombshell Taxi, LLC, et al.*, Index No. 650691-2015 (the "Citi Litigation"), was filed in the Supreme Court of the State of New York, New York County ("State Court"), by Citibank against various entities, including the Debtors (collectively the "Defendants"). In sum and substance, because the Citi Loans to eight (8) of the twenty-two (22) Debtors had matured on January 31, 2015 Citibank used the maturity of those eight Loans to declare a default under the Citi Loans to the other fourteen (14) Debtors even though those Loans were not in payment default and were not to mature until December 20, 2015.

13. Following significant litigation between the Defendants and Citibank before the State Court and the Appellate Division, First Department (the "Appellate Court"), the Appellate Court found that Citibank may seize the Medallions unless the Debtors posted a $50 million bond. The Debtors could not post the requisite bond and filed these Chapter 11 Cases prior to Citibank's seizure of the Medallions.

14. On July 29, 2015, the Debtors filed notices of removal of the Citi Litigation to the United States District Court for the Southern District of New York. On August 3, 2015, the Debtors filed a motion in the Citi Litigation to transfer venue of the Citi Litigation to the United States District Court for the Eastern District of New York. If granted, the Debtors intend to request that the Citi Litigation be transferred to this Court so that it can be adjudicated in connection with the Debtors' Chapter 11 Cases.

15. The purpose of the Chapter 11 Cases is to remain in possession of the Medallions and propose a plan of reorganization pursuant to which the obligations to Citibank will be restructured and repaid over an appropriate period, and the Debtors' unsecured creditors will be protected. The Debtors believe that if Citibank were to seize the Medallions and liquidate them precipitously in a currently illiquid market, the result would be catastrophic not only to the Debtors and their unsecured creditors, but to Citibank itself.

### c. The Debtors' Post-Petition Investigation Through the CRO

16. In addition to the efforts outlined in the CRO Motion, the Cash Management Motion and the DIP Motion, the CRO has made significant efforts since his employment and appointment (which remains subject to Court approval) to understand the Debtors business and ensure that the Debtors are treated fairly and appropriately in their relationship with the related Management Companies.

17. The reality is that the Debtors are physically unable to manage their Medallions and Taxi Vehicles themselves. The Debtors do not have their own real estate from which to house the Taxi Vehicles when they are not operated. Nor do the Debtors have the employees or systems required to manage the drivers or all the other aspects of a taxi business. Creating those systems to manage just forty-six (46) Medallions would be prohibitively costly. Accordingly, like most other Medallion owners, the Debtors rely upon an entity or entities that manage Medallions and Taxi Vehicles, in this case the Management Companies. The Debtors are duly compensated for this arrangement by way of the lease payments from the Management Companies.

18. The issue that the Debtors and Management Companies are related is not lost on the CRO or Debtors' counsel. Since the first day of his engagement, the CRO has been in

constant communication with the Management Companies and other parties in order to understand the relationship and ensure that it is fair to the Debtors. If the CRO does not independently conclude that the relationship is fair and appropriate, he will be the first to pursue the issue with the Management Companies or seek other, better opportunities for the Debtors. Indeed, at the Debtors' request, the CRO, Debtors' counsel and counsel to the Management Companies have already had a lengthy meeting with the United States Trustee's office for the purpose of addressing these issues and working to answer any concerns of the United States Trustee. The Debtors are continuing to work constructively with the Office of the United States Trustee and furnish them with necessary information.

19. The CRO's investigation and research into these matters to date, which has included contacting unrelated taxi medallion management companies, has revealed in summary the following: (i) most management companies are not taking on new medallions at this time; (ii) it would be difficult, if not impossible, for any management company to take over forty-six (46) medallions at one time; and (iii) management companies that may be interested have stated that they would pay between $2,400 and $2,600 per month per medallion depending on the associated Taxi Vehicle. Under the Debtors' arrangement with the Management Companies, they receive $159,802 per month ($3,473.96 per medallion), which at this juncture appears to be between thirty and forty percent (30 to 40%) over-market. In addition, the Debtors have contacted prospective experts in the industry and may procure expert testimony on the value of medallion leases if it becomes necessary.

20. It was the Debtors' intent to share the independent investigation and research of the CRO with respect to the Debtors' relationship with the Management Companies with the Court, the United States Trustee, and other parties when it is complete and thorough. However,

Citibank's shotgun filing of the emergency Application prompted the Debtors to provide a status report to, at the very least, demonstrate to the Court and other parties that these issues have been identified and are being dealt with appropriately. Of course, the Debtors fully reserve their right to supplement or amend their findings with additional information, all of which they intend to share with the Court, the United States Trustee, Committee and other parties timely.

## **OBJECTION**

21. Citibank's emergency Application is completely unnecessary and most of what it seeks has already been addressed by the Debtors in motions filed with the Court or by representation. Citibank is continuing its pattern of promoting destructive and costly litigation. Citibank's conduct is wasteful and unfortunate. The Debtors address each of Citibank's scattered requests below.

### a. The Requested Demand that the Debtor Open a DIP Account is Unnecessary

22. First, Citibank seeks an instruction mandating that the Debtors open a DIP Account consistent with the Operating Guidelines for the Office of the United States Trustee. This issue has already been addressed in the Debtors' own Cash Management Motion wherein the Debtors request authority to open a DIP Account and manage the Debtors' affairs through a single account of the Lead Debtor. In fact, the Debtors have already met with the United States Trustee and agreed to the terms (subject to confirmation) of an interim order authorizing the use of the Cash Management System pursuant to the Cash Management Motion, which will be presented to the Court at the August 26, 2015 hearing.

23. The Debtors do not require an instruction to open a DIP Account. The only ministerial issue prohibiting the opening of the DIP Account and employment of the Cash Management System is the Court's approval of the Cash Management Motion and CRO Motion

(the CRO needs an order authorizing his appointment before a financial institution will open a DIP Account under his control). The DIP Account will be opened immediately following the Court's entry of orders approving the Cash Management Motion and CRO Motion. In the meantime, any lease payments due the Debtors from the Management Companies are being housed in an escrow account of Debtors' counsel. Counsel is currently holding $159,802, which will be turned over to the Debtors immediately upon opening the DIP Account.

24.     Accordingly, Citibank's requested mandate that the Debtors open a DIP Account is entirely unnecessary and is thoroughly addressed by the Debtors in motions filed almost two weeks before the filing of Citibank's "emergency" Application.

### b. Citibank's Request for Turnover is Improper and Unnecessary

25.     Citibank requests in the Application that the Management Companies be directed to "turn over all property of the Debtors including without limitation all proceeds of the Medallions received prior to or after the Petition Date." First, it is unclear if Citibank is seeking the Management Companies' turnover of the lease amounts due the Debtors, or if Citibank is ignoring the lease relationship and asking for all receipts from the Medallions. If the latter, Citibank is ignoring the relationship between the parties and the fact that the Management Companies (or some other management company) has to provide a significant amount of work in order to operate the Medallions and Taxi Vehicles and will not do so without compensation.

26.     Citibank, without support, contends that:

> Shockingly, the Debtors own contentions, if true, establish that the Debtors have diverted and are continuing to divert estate assets to the affiliated non-debtor Management Companies. In short, the Debtors admit that the Medallion leases are sweetheart leases to insiders because the Management Companies collect all of the proceeds and remit them to or for the Debtors only the costs of carrying the Medallions and Vehicles. Thus, the entire value (all net proceeds) of the Medallions is retained by the Management Companies, and the Debtors have not indicated that they intend to reject/terminate those leases.

Application, ¶6 (emphasis in original).

27. Citibank uses inflammatory words like "diverted," "sweetheart," and "insiders," without any thought, research or regard to the implications. The Debtors have clearly disclosed all their relationships and have hid nothing from the Court or Citibank. The Debtors have lease arrangements with the Management Companies which are standard to the industry. The CRO is independently investigating the relationship between the Management Companies and the Debtors, and will propose taking whatever action is best for the Debtors, their estates and all their stakeholders. Further, as outlined above, the CRO's investigation to date has revealed that the relationship between the Management Companies and the Debtors is not "sweetheart" at all and in fact, appears to be well above-market. Further, the Debtors or insiders are not "diverting" estate assets. That is a careless and unsupported statement that should be retracted.

28. Citibank should provide support for their allegations and characterizations of these relationships. While it is certainly appropriate to question a relationship between debtors and affiliated non-debtors, as the CRO has and is, it is completely inappropriate to characterize those relationships without doing any research or having any factual basis to do so.

29. Moreover, Citibank's feigned "shock" at the Debtors' relationship with the Management Companies is disingenuous. As set forth in the Debtor's first-day declaration of Evgeny Freidman, in 2011 Citibank promoted its cash management system to the Management Companies, the Debtors and other non-debtor medallion owners, and insisted that the Management Companies maintain their cash management accounts with Citibank as a condition of financing the Debtors. For approximately three years, the Management Companies, the Debtors as well as other non-debtor medallion holders all used a Citibank-designed and maintained cash management system consistent with the system it uses now. Accordingly,

Citibank has been well aware of, if not intimately familiar with, the Debtors' leasing relationship with the Management Companies and the Debtors' cash management practices for years. This arrangement continued from the inception of the Citibank Loans to the Debtors until Citibank abruptly, and without reason, terminated the Management Companies' cash management accounts on May 8, 2014. Citibank's feigned "shock" and use of inflammatory rhetoric is disingenuous at best.

30. Finally, Citibank cites no legal authority for its requested turnover instruction. In the Debtors' view, only the Debtors are permitted to pursue the turnover of estate property pursuant to section 542 of the Bankruptcy Code. Accordingly, as a preliminary legal matter, Citibank does not even have the authority to make this request.

### c. Citibank's Request that the Debtors be Instructed not to Spend Citibank's Cash Collateral is Unnecessary

31. Section 363(c)(2) of the Bankruptcy Code clearly and expressly prohibits the Debtors' use of a lender's cash collateral unless "each entity that has an interest in such cash collateral consent;" or "the court, after notice and a hearing, authorizes such use, sale, or lease. . . " 11 U.S.C. §363(c)(2).

32. Citibank is seeking a directive from this Court that reiterates what the Bankruptcy Code already states and requires. It is completely unnecessary as a legal matter. Moreover, this requirement has been fully acknowledged by the Debtors. The Debtors state clearly in the DIP Motion and elsewhere that they do not intend to utilize any of Citibank's alleged cash collateral. In fact, the necessity of the DIP Loan is to fund these Chapter 11 Cases without touching anything that could arguably be considered Citibank's cash collateral. Citibank's request is

redundant an in the form of a "comfort order" that is neither necessary nor productive.[2]

33.     Based upon the foregoing, Citibank's request with respect to cash collateral use restrictions should be denied as unnecessary.

### d. Any Discovery Under Bankruptcy Rule 2004 Should be Carefully Tailored and Timed

34.     The Debtors are very concerned based upon the filing of the emergency Application that Citibank is going to continue its pre-petition war of economic attrition in this Court. Accordingly, the Debtors believe that any discovery sought by Citibank must be carefully limited and tailored to ensure that Citibank is not inappropriately trying to obtain under Bankruptcy Rule 2004, what it should be getting under the Federal Rules of Civil Procedure (the "Federal Rules") during the normal course of discovery in the Citibank Litigation.

35.     To begin, Citibank's request for Bankruptcy Rule 2004 discovery (the "Rule 2004 Request") has myriad flaws and, notably, Citibank does not cite a single case in support of its Rule 2004 Request. As it pertains to Bankruptcy Rule 2004 discovery, Citibank states only that it "seeks 2004 discovery on an emergency basis to determine the location and amount of estate property that constitutes its cash collateral that may be in the hands of non-Debtors and may have been or will be improperly transferred or expended." Application, ¶12. Similarly, the accompanying declaration of Nathan Schwed (the "Schwed Declaration") requests an order

---

[2] It should also be noted that the Debtors believe that Citibank is adequately protected and in fact, possesses a significant equity cushion. According to the expert analysis and opinion of Matthew W. Daus, the former Commission and Chair of the TLC, set forth in detail in an affirmation dated June 29, 2015 procured by the Debtors in connection with the Citibank Litigation, the Medallions have a present value of $950,000 each, giving the Medallions a total value of $43,700,000. Citibank asserts that it is owed approximately $34 million (at least $3.8 million of which is default interest and penalties that the Debtors dispute). Even assuming Citibank is right in the assessment, it is over-secured by nearly $10 million (or thirty (30%) percent). "It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection." In re AMR Corp., 490 B.R. 470, 478 (S.D.N.Y. 2013) (20%+ cushion); see also In re Boodrow, 126 F.3d 43, 53 (2d Cir. 1997) (10% cushion) (adequate protection exists when the "value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim" (citation omitted)); In re Dindiyal, No. 892-80432-478, 1993 WL 540373, at *8 (E.D.N.Y. Sept. 30, 1993) ("large equity cushion clearly constitutes adequate protection").

13

"authorizing examinations pursuant to Bankruptcy Rule 2004 and production of the documents identified on Exhibit A." Schwed Declaration ¶ p.2, § (c).

36. Citibank does not state who it intends to examine, the nature and scope of the examination, whether it intends to issue subpoenas *duces tecum* (individually a "Subpoena" and collectively the "Subpoenas") to the unidentified examinees, the timing of the examination, or the rationale for the examinations on an emergency basis. Exhibit A annexed to the Schwed Declaration requests several items from the Debtors, but Citibank has not specified whether it will be requesting additional documents through a properly issued Subpoena or when these documents must be delivered. Any permitted discovery request by Citibank should be pursuant to a properly tailored Subpoena issued to the Debtors in accordance with the more restrictive Federal Rules.

37. Bankruptcy Rule 2004(a) states that "[o]n motion of any party in interest, the court may order the examination of any entity." FED. R. BANKR. P. 2004. The scope of a Rule 2004 examination is "unfettered and broad" and "is commonly recognized as more in the nature of a fishing expedition" where "procedural safeguards of witnesses are at a minimum." In re Bennett Funding Group, Inc., 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) ("Bennett Funding"); In re Coffee Cupboard Inc., 128 B.R. 509, 516 (Bankr. E.D.N.Y. 1991); In re Duratech Indus., Inc., 241 B.R. 283, 289 (E.D.N.Y. 1999) ("The scope of a Rule 2004 examination is exceptionally broad and the rule itself is 'peculiar to bankruptcy law and procedure because it affords few of the procedural safeguards that an examination under Rule 26 of the Federal Rules of Civil Procedure does.' "). The party seeking discovery under Rule 2004 has the burden to show good cause for the examination and relief lies within the sound discretion of the bankruptcy court. See SIPC v. BLMIS, No. 09-11893, 2014 WL 5486279, *2 (Bankr. S.D.N.Y. Oct. 30, 2014).

38.     Bankruptcy Rule 2004 examinations are appropriate for revealing the nature and extent of the bankruptcy estate and examining certain assets and transactions, but "the availability of Rule 2004 as a discovery tool is not unlimited." See In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (internal citations omitted).  As is relevant here, the use of Bankruptcy Rule 2004 is limited by the well-established rule that once an adversary proceeding or contested matter is commenced, discovery must proceed under the Federal Rules and not by Rule 2004. Id.  The basis for the restriction on Bankruptcy Rule 2004 lies in the distinction between the broad nature of Bankruptcy Rule 2004 and the more restrictive nature of discovery under the Federal Rules.  Id. at 840–41; Bennett Funding, 203 B.R. at 28 ("[C]ourts are wary of attempts to utilize Fed. R. Bankr. P. 2004 to avoid the restrictions on of the [Federal Rules] in the context of adversary proceedings.").

39.     Courts inside and outside of this Circuit have questioned the propriety of Bankruptcy Rule 2004 examinations where the party requesting the Bankruptcy Rule 2004 examination could benefit their litigation pending outside of the bankruptcy court by circumventing the more restrictive discovery provisions of the Federal Rules. Enron, 281 B.R. at 842; In re Coffee Cupboard Inc., 128 B.R. 509, 516–17 (Bankr. E.D.N.Y. 1991) (noting that 2004 examination cannot be used to obtain information for use in pending state court litigation because Rule 2004 does not provide the protections of the Federal Rules and further directing the debtor to produce documents related only to the bankruptcy action); Bennett Funding, 203 B.R. at 29 (ruling that when an adversary proceeding is pending outside of the bankruptcy case, "discovery of evidence *related* to the pending proceeding must be accomplished in accord with the more restrictive provisions of the [Bankruptcy Rules 7026 *et seq.*], while *unrelated* discovery should not be subject to those rules simply because there is an adversary proceeding) (emphasis

in original); Snyder v. Soc'y Bank, 181 B.R. 40, 42 (S.D.Tex.1994), aff'd sub nom. In re Snyder, 52 F.3d 1067 (5th Cir.1995) (characterizing the use of Rule 2004 to further a state court action as an abuse of Rule 2004 and affirming bankruptcy court decision denying production under a subpoena issued under Rule 2004 where appellant's primary motivation was to use those materials in a state court action against the examinee); In re Washington Mutual, Inc., 408 B.R. 45, 51 (Bankr. D. Del. 2009) (finding that when litigation is pending in another forum "[t]he primary concern of courts is the use of Rule 2004 examinations to circumvent the safeguards and protection of the [Federal Rules]" and the "relevant inquiry is whether the Rule 2004 examination will lead to discovery of evidence related to the pending proceeding").

40. Since March 6, 2015, Citibank, the Debtors and certain non-debtors have been embroiled in the Citi Litigation. The courts have made clear that Citibank cannot use the discovery under Bankruptcy Rule 2004 to augment its pleadings and investigation in the Citibank Litigation. The Debtors acknowledge that Citibank, as the Debtors' secured lender, is entitled to some discovery but submit that discovery must proceed under the more restrictive Federal Rules and be tailored to claims and issues, if any, in these Chapter 11 Cases. For example, the Bankruptcy Court in In re Coffee Cupboard compared the pleadings in state court to each request for documents under Bankruptcy Rule 2004 in bankruptcy court and denied the document requests to the extent they sought information that could be used in connection with the pending state court litigation. In re Coffee Cupboard, Inc., 128 B.R. at 516–17. The Debtors request that the 2004 Request be denied, that discovery proceed under the Federal Rules 26 *et seq.*, and that future requests for documents and examinations, if any, be related only to Citibank's claims in these Chapter 11 Cases and not used as in furtherance of the Citi Litigation.

41. In addition, an official committee of unsecured creditors (a "Committee") has not

yet been formed or appointed by the Office of the United States Trustee. Practically speaking, the Debtors believe that any Committee would also like to participate in discovery and will demand many of the same documents and examinations that may be sought by Citibank. The Debtors request that the 2004 Request be denied so that a Committee, if appointed, can also participate in discovery, thereby sparing the Debtors from duplicative and wasteful discovery. As described above, Citibank is not being prejudiced and the Debtors have addressed all of the concerns raised in the Application such that emergency examinations of unknown parties are not warranted or necessary.

## **CONCLUSION**

42.　　There was no need for the Application and certainly no need for it to be brought on an emergency basis on three days' notice. An overwhelming majority of the issues raised in the Application were answered by pleadings filed by the Debtors nearly two weeks ago, or could be resolved or answered with a phone call or email. Citibank's actions have historically been, and apparently continue to be, wasteful, unnecessary and if successful, devastating to the Debtors and all their other creditors. Accordingly, Citibank's Application should be denied.

*[Continued on next page]*

**WHEREFORE**, the Debtors respectfully request that the Court enter an order denying the Application in its entirety, or, alternatively, authorizing Citibank to conduct limited, and carefully tailored discovery pursuant to Bankruptcy Rule 2004 through the issuance of Subpoenas under the Federal Rules after the United States Trustee has had an adequate time to solicit interest and form a Committee, and for such other and further relief as is just.

Dated: New York, New York
        August 12, 2015

                                **KLESTADT WINTERS JURELLER**
                                  **SOUTHARD & STEVENS, LLP**

                          By:  */s/ Fred Stevens*
                               Fred Stevens
                               Sean C. Southard
                               Maeghan J. McLoughlin
                               570 Seventh Ave., 17th Floor
                               New York, New York 10018
                               Tel: (212) 972-3000
                               Fax: (212) 972-2245
                               Email: fstevens@klestadt.com
                                             ssouthard@klestadt.com

                               *Proposed Attorneys to the Debtors and*
                                  *Debtors in possession*