| | |
|---|---|
| **FOX ROTHSCHILD LLP**<br>100 Park Avenue, 15th Floor<br>New York, NY 10017<br>Tel: (609) 896-3600<br>Fax: (609) 896-1469<br>Hal L. Baume<br>Brett Berman | **Hearing Date: August 13, 2015**<br>**Hearing Time: 3:30 p.m.** |

*Attorneys for Downtown Taxi Management, LLC,*
*Woodside Management, Inc., Tunnel Taxi*
*Management, LLC and 28th Street Management, Inc.,*
*and Evgeny (Gene) Freidman*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| HYPNOTIC TAXI LLC, <u>et al.</u>,[1] | : | Case No. 15-43300 (CEC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------x

## MANAGEMENT COMPANIES' OPPOSITION TO
## APPLICATION IN SUPPORT OF ORDER DIRECTING TURNOVER AND
## AUTHORIZING BANKRUPTCY RULE 2004 EXAMINATIONS

Downtown Taxi Management, LLC, Woodside Management, Inc., Tunnel Taxi Management, LLC and 28th Street Management, Inc., (collectively, the "<u>Management Companies</u>"), by and through their counsel, Fox Rothschild LLP, hereby submit their Opposition to the "Application in Support of Order Directing Turnover and Authorizing Bankruptcy Rule

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Hypnotic Taxi LLC (6632)(Case No. 15-43300); (ii) Bombshell Taxi LLC (1282)(Case No. 15-43301); (iii) Bourbon Taxi LLC (7155)(Case No. 15-43302); (iv) Butterfly Taxi LLC (6992)(Case No. 15-43303); (v) Candy Apple Taxi LLC (0249)(Case No. 15-43304); (vi) Chianti Taxi, LLC (6799)(Case No. 15-43305); (vii) Chopard Taxi Inc. (0746)(Case No. 15-43306); (viii) Cupcake Taxi LLC (0324)(Case No. 15-43307); (ix) Dorit Transit Inc. (9129)(Case No. 15-43308); (x) France Taxi LLC, (9592)(Case No. 15-43309); (xi) Hennessey Taxi Inc. (4039)(Case No. 15-43310); (xii) Iceberg Taxi Inc. (5877)(Case No. 15-43311); (xiii) Marseille Taxi LLC (9890)(Case No. 15-43312); (xiv) Merlot Taxi LLC (7103)(Case No. 15-43313); (xv) Milkyway Cab Corp. (5061)(Case No 15-43314); (xvi) Palermo Taxi, Inc. (5956)(Case No. 15-43315); (xvii) Pinot Noir Taxi LLC (6725)(Case No. 15-43316); (xviii) Pointer Taxi LLC, (2323)(Case No. 15-43317); (xix) Pudding Taxi Inc. (0432)(Case No. 15-43318); (xx) Stoli Taxi Inc. (4079)(Case No. 15-43319); (xxi) Vodka Taxi LLC (4239)(Case No. 15-43320); and (xxii) VSOP Taxi Inc. (3909)(Case No. 15-43321).

2004 Examination" (the "Application") filed by Citibank, N.A. ("Citibank"). In support of their Opposition, the Management Companies respectfully represent as follows:

## BACKGROUND

1. The *Affidavit of Evgeny Freidman pursuant to E.D.N.Y. Local Bankruptcy Rule 1007-4* (the "Freidman Affidavit") (Docket No. 2) contains a detailed description of the Debtors' businesses, property and financial condition.[2]

2. As set forth in the Freidman Affidavit, the Management Companies lease from the Debtors the medallions ("Medallions") issued by the New York City Taxi and Limousine Commission and the vehicles (the "Taxi Vehicles"). The Management Companies receive the gross revenues from their operation of the Taxis Vehicles (the "Revenues"), and pay therefrom their costs and expenses associated with the operation of such Taxi Vehicles, including insurance coverage, vehicle maintenance and repairs.

3. The Management Companies' monthly base lease obligation (the "Lease Payment") to each of the Debtors is equal to the monthly debt service to Citibank. They have made their Lease Payments by paying the debt service on the Loans with Citibank, as well as on any Taxi Vehicle loans, on behalf of the Debtors. See Freidman Affidavit, ¶ 7.

4. The Management Companies have not filed petitions for relief and are not debtors under the Bankruptcy Code.

**CITIBANK MAY NOT OBTAIN ANY RELIEF AGAINST
THE MANAGEMENT COMPANIES BY THIS APPLICATION**

5. Citibank filed the Application, seeking an Order (on three days' notice) directing, among other things, "the Management Companies to turn over to the debtors all property of the

---

[2] Capitalized terms not defined herein having the meanings ascribed to them in the Freidman Affidavit.

2

ACTIVE 31127962v3 08/12/2015

Debtors including without limitation all proceeds of the Medallions received prior to or after the Petition Date." Schwed Declaration, p. 1, §(b).

6.      The Order To Show Cause requires Citibank to serve the Debtors and various other parties, but, notably, not the Management Companies.

7.      This turnover request – seeking "all property of the Debtors," including "all proceeds of the Medallions" – is unclear in its application to the Management Companies. The only property that the Debtors are entitled to from the Management Companies are the Lease Payments due for August, 2015, which the Management Companies were prepared to pay as soon as the Debtors received authority to and actually opened DIP bank accounts into which to deposit those Lease Payments (see pending Cash Management Motion, Docket No. 17 ). However, the Management Companies have now paid the August 2015 Lease Payments to the Debtors' counsel's attorney trust account.

8.      If Citibank is actually seeking turnover of the Management Companies' Revenues – as opposed to simply the August 2015 Lease Payments – then it is, in effect, asking for some kind of prejudgment freeze on non-Estate assets without either: (a) filing the requisite adversary proceeding "to determine the validity, priority, or extent of a[n] . . . interest in property" under Fed. R. Bankr. P. 7001(2); or (b) demonstrating entitlement to injunctive relief. See, e.g., Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). The Management Companies are entitled to due process, including service of a summons and complaint, before injunctive relief is considered by the Court.

3

ACTIVE 31127962v3 08/12/2015

9. To the extent that Citibank is contending that the Management Companies' Revenues are somehow property of the Debtors' estates that may constitute its cash collateral, that contention is without merit. Although the Management Companies take no position at this time and make no admissions in this regard, the only property of the Debtors upon which Citibank can possibly argue constitutes its cash collateral (i.e., the proceeds of the Medallions) are the Lease Payments.

10. The Revenues are property of the Management Companies, not property of the Debtors' estates. See 11 U.S.C. § 541(a)(1) (estate consists of "all legal or equitable interests of *the debtor* in property as of the commencement of the case" (emphasis added)). Here, the Debtors leased the Medallions to the Management Companies and received the rights to the Lease Payments. They have no right to the Revenues generated by the Management Companies.

11. Moreover, the Management Companies believe that, in the context of an adversary proceeding with fair and proper notice and an opportunity to be heard, the Debtors would be able to demonstrate that even if such Revenues were property of the Debtors' estates (which they are not), they would not constitute the "proceeds" of Citibank's collateral. See, e.g., 1st Source Bank v. Wilson Bank & Trust, 735 F.3d 500, 504 (6th Cir. 2013) ("Cases interpreting the UCC and the associated state statutes in other jurisdictions likewise uniformly support the proposition that revenues earned through the use of collateral are not proceeds."); In re Gamma Ctr., Inc., 489 B.R. 688, 696 (Bankr. N.D. Ohio 2013) ("The Bank cites no authority that supports its position, and the court is not persuaded, that accounts receivable or funds collected thereon as the result of using equipment collateral constitute proceeds under the UCC."); In re Las Vegas Monorail Co., 429 B.R. 317, 333–36 (Bankr. D. Nev. 2010) (holding that the term "proceeds" does not include business income generated from customer fares because the fares

are not "collected on, or distributed on account of" the monorail's franchise agreement with the city, nor are they "arising out of the collateral").

### THE APPLICATION IS A MANUFACTURED EMERGENCY: MANAGEMENT COMPANIES HAVE ALREADY AGREED TO PROVIDE INFORMATION AND THE DEBTORS HAVE ALREADY AGREED TO HOLD LEASE PAYMENTS IN DIP ACCOUNTS

12. A meeting was held on August 5, 2015 at the Office of the United States Trustee between various representatives of the United States Trustee, the Debtors' counsel and their Chief Restructuring Officer ("CRO"), and Hal L. Baume, counsel for the Management Companies. At that meeting, the Management Companies advised that, subject to appropriate limitations and protections, they would share information with the CRO regarding the Leases, the Revenues, and the monthly operating expenses they incurred and paid with respect to same so that he could provide the U.S. Trustee representatives with answers to their questions regarding same. The Management Companies agreed to provide such information in the spirit of cooperation even though their revenues and expenses are not property of the Debtors' estates and advised that they reserved all rights regarding same.

13. In the Debtors' line of business, leasing medallions is the industry standard and the CRO advised that he would conduct a thorough industry survey of the monthly amounts paid on medallion leases. The CRO intended to compare the fair market amount of lease payments in the industry with the amount of the Lease Payments being made by the Management Companies to the Debtors and to share the results with the U.S. Trustee. Thus far, based on initial (albeit incomplete) review, the CRO has found that the fair market amount for monthly medallion lease payments range from $2,400 to $2,600 per medallion. The Debtors receive Lease Payments – that are based on the monthly Citibank loan payment – in excess of those sums. See Freidman Affidavit, ¶ 33.

5

14. At the appropriate time, an expert can be engaged, if necessary, to opine on the fair market leasing rate for medallions which the Management Companies believe will support the CRO's initial findings. Unfortunately, due to the three day notice of this hearing, the CRO could not complete his review and a determination of the need for an expert could not be made.

15. In various pleadings filed in these cases, as well as at the aforesaid meeting, the Debtors advised that they would: (a) deposit all Lease Payments received from the Management Companies into DIP bank accounts once approved by this Court and opened, for which a Cash Management Motion is pending (see Cash Management Motion, Docket No. 17)), and (b) hold the Lease Payments in such DIP accounts pending an Order of the Bankruptcy Court authorizing their use or other disposition thereof. Accordingly, the concerns raised in the Application have previously been addressed in various pleadings in this Court or in conferences with the U.S. Trustee, and the Application should be denied as being wasteful and unnecessary.

**CONFIDENTIALITY AND EFFICIENCY CONDITIONS SHOULD BE IMPOSED ON ALL RULE 2004 EXAMINATIONS / REQUESTS FOR PRODUCTION FROM NON-DEBTOR MANAGEMENT COMPANIES**

16. The Management Companies lease numerous medallions (and operate taxi cabs pursuant thereto) from various non-debtor entities unrelated to these cases. Accordingly, the Management Companies request that, if the Court grants Citibank's request, any Rule 2004 examinations of (and/or document production by) the Management Companies be limited only to the Revenues and expenses associated with the Debtors' Medallions.

17. Furthermore, as discussed in the Freidman Affidavit, the Debtors are informed and believe that Citibank is developing a significant business relationship with their competitor Uber. See Freidman Affidavit, ¶¶ 27-28. Hence, any Rule 2004 examinations of (and/or document production by) the Management Companies should be conditioned upon Citibank's entry into a customary and appropriate non-disclosure (confidentiality) agreement, requiring

6

Citibank to keep the information it receives confidential and to properly limit its use. See, e.g., In re Metiom, Inc., 318 B.R. 263, 271 (S.D.N.Y. 2004) ("courts have typically found confidentiality agreements . . . protect parties subject to examinations from the use of information gained in those examinations for improper competitive purposes"); In re Refco Inc., 336 B.R. 187, 191 (Bankr. S.D.N.Y. 2006) ("the Court granted the Committee's motion for discovery under Bankruptcy Rule 2004 only after the imposition of certain confidentiality requirements").

18.     Finally, it is possible the U.S. Trustee will appoint an official committee of unsecured creditors in the Chapter 11 Cases and that such committee and/or the U.S. Trustee may desire to conduct Rule 2004 examinations of the Management Companies. In order that such examinations do not become unduly burdensome, the Management Companies respectfully request that the Court direct Citibank to coordinate with the U.S. Trustee and any appointed committee to conduct a joint Rule 2004 examination, during which the Management Companies will respond to all interested parties in one venue at the same time.

**WHEREFORE,** the Management Companies respectfully request that the Court: (1) deny Citibank's request that the Management Companies turnover their Revenues; (2) limit any Rule 2004 examinations of and/or document production by the Management Companies solely to the Revenues and expenses associated with the Debtors' Medallions; (3) condition the Management Companies' participation in any Rule 2004 examinations or document production on (a) Citibank's prior execution of a nondisclosure (confidentiality) agreement and (b) proper notice and a subpoena in compliance with Fed. R. Bankr. P. 9016; and (4) direct Citibank to coordinate any Rule 2004 examination of the Management Companies with other interested parties.

Dated: New York, NY
August 12, 2015

**FOX ROTHSCHILD LLP**

By: */s/ Hal L. Baume*
Hal L. Baume
100 Park Avenue, 15th Floor
New York, NY 10017
Tel: (212) 972-3000
Fax: (212) 896-1469
Email: hbaume@foxrothschild.com

*Attorneys for Downtown Taxi Management, LLC, Woodside Management, Inc., Tunnel Taxi Management, LLC and 28th Street Management, Inc., and Evgeny (Gene) Freidman*

8